Gridley, Vice Chancellor.
The question arising upon the
demurrer is, whether a grantee of lands bound by a usurious mortgage is a “borrower,” within the fourth section of the act passed in 1837, (Sess. L. of ’37, p. 486, 7,) so as to entitle him to relief in chancery on a bill filed to set aside the mortgage, without tendering-or depositing the sum actually due thereon.
•Prior to the revised statutes, the court of chancery,required of a suitor who invoked its aid against a usurious security, that he should do equity as a condition of receiving it; and refused to grant him any relief, except on the terms of paying *393 or offering to pay the sum which was justly due. The eighth section of 1 R. S. 772 dispensed with this condition in certain cases and to a certain extent; and then came the act of 1837, which dispensed with it in favor of the borrower, upon a bill filed for discovery or relief against usury.
The counsel for the complainants contend that the word “ borrower ” should receive a liberal interpretation, so as to embrace every person who, as a party in interest, seeks relief against usury; that there is no good reason for any such distinction as the more restricted meaning would indicate, and that none such was within the intention of the framers of the act.
I am induced to come to the opposite conclusion for the following reasons:
1. The word “ borrower” has a definite meaning, wholly inapplicable to any other than one who is a parly to the contract for the usurious loan; and had the legislature intended to dispense with the condition in question in all cases, nothing was easier than to have said so. It is also worthy of remark that a question was raised upon the meaning of the word “borrower,” as used in the provision of the revised statutes before cited, in the case of Livingston v. Harris, (11 Wend. 329,) several years before the passing of the act of 1837. The legislature, therefore, in the last act, must have used the term with full knowledge that the restricted meaning had been claimed for it in that case; and had they intended a more enlarged meaning, they would probably have expressed their will in unqualified language.
2. The legislature may well be deemed to have regarded the real “ borrower,” the victim of the usurer, with more favor than a grantee of lands bound by the mortgage, who may have purchased the lands with reference to the incumbrance, and with a deduction from the purchase price equal to the amount of such incumbrance.
3. Tjie chancellor and court of errors both seem to have recognized the necessity of giving the term “ borrower” its ordinary signification, though they held that a surety upon an usurious note, being a party to the contract, was to be regarded *394 as a “ borrower,” notwithstanding the principal received all the money upon the loan. (11 Wend. 329; 3 Paige, 528.)
C. P. Kirkland, for the appellant.
1. The invariable rule in equity is, that a bill to set aside or affect a usurious contract,. whether filed for relief or discovery, or for both, cannot be maintained without paying or offering to pay the amount actually loaned. (Mason v. Gardiner, 4 Pro. C. C. 436; Rogers v. Rathbun, 1 Johns. Ch. Rep. 367; Fanning v. Dunham, 5 id. 142; Scott v. Nesbit, 2 Pro. C. C. 641; S. C. 2 Cox, 183; Henkle v. Royal Exchange Assurance Company, 1 Ves. Sen. 320; Ex parte Scrivener, 3 Ves. & Beame, 14; Livingston v. Harris, 11 Wend. 329; S. C. 3 Paige, 528, 533.) 2. The eighth section of 1 R. S. 772, and the fourth section of the act of May, 1837, (Sess. L. of ’37, p. 487, § 4,) do indeed modify this rule to a certain extent, but the modification only extends to the case of the “ borrower.” 3. The respondents here are not borrowers in any sense. They are therefore subject to the general rule of equity, and do not come within the exception created by the above statutes. The word 11 borrower” has a well understood and definite meaning, wholly inapplicable to persons standing in the relation of the respondents. Nor are they within the reasons which prompted the legislature to provide for the case of the “ borrower.” Had the legislature meant to extend the aid of these statutes to parties occupying the position of the respondents, that meaning might easily have been expressed, and doubtless would have been, especially after the discussions and decision in the case of Livingston v. Harris, above cited. 4. These statutes are penal in their character and consequences, and have altered a long established and well known rule of equitable jurisprudence. • They are not, therefore, to be extended by construction, nor by judicial legislation. (Cole v. Savage, 1 Clarke's Ch. Rep. 482; Per Sutherland, J. in Livingston v. Harris, 11 Wend. 336; Per Tracy, Senator, id. 342; Perrine v. Striker, 7 Paige, 598, 602; Dwarr. On Stat. 696, 701, 735, 750, 755; Jones v. Smart, 1 T. R. 52; Jenkinson v. Thomas, 4 id. 665; Waller v. Harris, 20 Wend. 561, 2, per Bronson, J.; Henry v. Bank of Salina, 5 Hill, 541, per Putnam, Senator ; id. 543,4, per Rhoades, Senator; id. 552, per Wright, Senator; Myers v. Foster, 6 Cowen, 567, 569; Bradley v. Clarke, 5 T. R. 201; 14 Petersd. Abr. 712, 717, 719; Cone v. Bowles, 1 Salk. 205; Bunb. Rep. 106.) 5. In the present case, as the bill contains no averment of payment or offer to pay the sum actually advanced, it is radically defective, and the chancellor therefore erred, in reversing the decision of the vice chancellor.
*394 The result is that the demurrer must be allowed, and the bill dismissed with costs.
This decision was reversed by the chancellor in May, 1844, for the reasons given by him in Cole v. Savage, (10 Paige, 583,) and Post thereupon appealed to this court.
Ward Hunt, for the respondents.
1. The ancient rules of law upon the subject of usury were strict and rigid, but the provisions of the statute of 1837 have received a liberal and extended construction. (1 Johns. Ch. Rep. 367, 439; 5 id. 121; 11 Wend. 329; 3 Paige, 528; 9 id. 197, 199; 5 Hill, 523, et seq.) 2. The whole statute of ] 837, taken together, shows that the word “ borrower” in the fourth section was not intended to be used in a strict, technical sense. (Laws of ’37, p. 487, §§ 1 to 5; 5 Hill, 534, 538, 545.) 3. The present case is within the mischief intended to be remedied by the statute, and the respondents are entitled to the relief prayed for in their bill. (Cole v. Savage, 10 Paige, 583.)
Barlow, Senator.
The question to be decided in this case is, whether the respondents are borrowers, within the meaning of 1 R. S. 772, § 8, and the usury law of 1837. (Sess. L. of ’37, p. 487, § 4.)
The appellant, Post, holds a mortgage executed by Anson Dart and his wife for a usurious loan, dated the 26th of March, 1835. The respondents obtained a judgment against Dart in October, 1839, upon which they issued a fi. fa., sold the mort *396 gaged premises, and took a sheriff’s deed, bearing date the 18th of July, 1843; and they have filed their bill to cancel the mortgage as being void on the ground of usury, without having paid or offering to pay the sum actually loaned by Post to Dart.
Had a bill been filed by Dart against Post, the case would have been within the policy of the statute, which was undoubtedly intended to protect borrowers, in the ordinary acceptation of the term, against usurious contracts in which they might become involved. Dart was a borrower from Post. But there was no privity of dealing between the parties to this suit. The respondents are in no sense borrowers from the appellant, and lie has strong equities for the money actually loaned, and is as much a creditor in fact to that amount as the respondents are.
It was said by the respondents’ counsel that if the appellant had assigned the. mortgage, Dart could have filed his bill against the assignee. This is undoubtedly true, for Dart would still be the borrower.
To extend the word bortowet so as to embrace the respondents, would be departing entirely from its legitimate meaning. That sureties and heirs at law should be considered as coming within its meaning, as used in the statute, is reasonable, for they represent the borrower in the contract, and may be made parties to a suit instituted for enforcing it,
Statutes should be considered as meaning what they express in the ordinary acceptation of the language used, and not as mysterious rules, of hidden import, requiring extraordinary powers of mind to expound and apply them, Had the legislature, which was composed of sound practical men, intended to have included judgment creditors in the provision in question, they would doubtless have said so expressly,
It was conceded by the respondents’ counsel that, if the statute had not interfered with the general rule of equity on this subject, the bill was defective, for the reasons specified in the demurrer of the appellant. And being of opinion that the statute has no application to the case of the respondents, I am in favor of reversing the chancellor’s decision, and affirming that •of-the vice chancellor.
*397 Lott, Senator.
The question presented by the demurrer in this case is, whether a purchaser under a sheriff’s sale, of property covered by a usurious mortgage, is to be considered a “ borrower,” within ttie meaning of the fourth section of the act to prevent usury, passed in May, 1837. (Laws of 1837, p. 487.)
Previous to the adoption of the revised statutes, it was the well settled rule of the court of chancery that no relief against a usurious mortgage could be obtained without the repayment of the money actually lent, with lawful interest. It was inconsistent with the principles of equity that a borrower should be permitted to hold the money of the lender without any consideration for it. A modification of this rule was made by the revised statutes, (1 R. S. 772, § 8,) dispensing with the payment or a deposit of the principal sum, or any part thereof, as a condition of granting relief to the borrower on a bill filed for that purpose, where there was no discovery asked; and by the act of 1837 the provision was extended to bills filed for discovery as well as relief.
The object of the bill in this case is to enforce the forfeiture of the whole debt of the appellant; and ás it is a well settled principle that the court of chancery will not lend its aid to such an inequitable object, it becomes important to inquire whether the complainant below can avail himself of the privilege afforded to a borroioer.
The term borrower has a well known and definite meaning. It is used in contradistinction to lender, and is intended to designate one of the parties to a contract for a loan, and may be extended to those standing in his place in a representative capacity, as heirs at law, executors or administrators; but I think it is a forced construction to treat him as a borrower who is entirely disconnected with the loan, and not bound in any way to pay the sum borrowed.
The chancellor in the case of Cole v. Savage, (10 Paige, 583,) on the authority of which this case was decided, .appears to concede that the word borrower, in its literal sense, applies only to the original debtor; but he insists that the act is remedial, and'ought to be construed liberally, and that it may b.e ex *398 tended by construction to other cases within the same mischief, though not within the words of the statute. I concede that remedial statutes are to be construed liberally, but I cannot concede that a statute is remedial which creates not only a forfeiture of the money lent, but renders the party, violating its provisions guilty of a misdemeanor, and punishable by fine and imprisonment. On the contrary, it appears to me that such a statute is penal in its character, and subject to a strict construction.
If the legislature had intended to extend the provisions of the section above mentioned to any other person than the party to the usurious contract, it is reasonable to presume they would have used terms which would have expressed their intention. It was well remarked by the learned vice chancellor by whom this cause was originally decided, that if the legislature had intended to dispense with the conditions in question in all cases, nothing was easier than to have said so; and when we take into consideration the fact alluded to by him, viz. that the meaning of the term borrower had been the subject of discussion in Livingston v. Harris, (3 Paige's Rep. 528, 11 Wend. Rep. 335,) the decision in which undoubtedly caused the passage of the act of 1837, and that the legislature did not in that act alter the previous law in this respect, it is reasonable to presume they did not intend to extend the term beyond its ordinary meaning and acceptation.
But if the act is to be construed liberally, I do not see upon rvhat principle its provisions can be extended to a purchaser Avho must be presumed to buy the land with reference to the incumbrance, and with a deduction in the price equal to the amount of it.
The act was intended for the relief of the victim of the usurer, and every construction conducive to that object would be consistent Avith the act. Here, hoAvever, the borrower does not claim or seek relief. On the contrary, he has suffered a decree to pass against him on the bill filed for the foreclosure of the mortgage, and the decision of the chancellor-in the case in question, instead of affording relief to him, would give his property to his judgment creditor, at a price below its real value to the *399 extent of the usurious mortgage, without any benefit whatever to him.
Upon the whole, I am of opinion that the decision of the chancellor is erroneous, and that his decree should be reversed.
Wright, Senator.
It was conceded upon the argument of this cause,«that if the Utica Bank were not “ borrowers,” within the fourth section of the “ act to prevent usury,” passed May 15th, 1837, the demurrer to their bill was well taken, because it contained no allegation of payment of the amount actually loaned by Post to Dart, nor any offer to pay; the well settled rule of the court of chancery being, independent of the provisions of our usury laws, that a bill to set aside a usurious contract, whether filed for discovery or relief, must contain such allegation or offer. (1 John. Ch. Rep. 367, 439; 5 id. 142; 3 Ves. & Beame, 14; 3 Paige, 533; S. C. 11 Wend. 329.)
This rule was altered by the revised statutes (1 R. S. 772, § 8) and by the act of May, 1837, so far as to exempt'the “borrower ” of money, who sought relief or discovery from a usurious contract, from the necessity of paying or offering to pay the sum actually loaned, or any portion thereof. The question presented for consideration, therefore, is simply this: Is the purchaser at a sheriff’s sale,- of premises covered by a usurious mortgage, a “borrower” of the money loaned to the mortgagor, within the true intent and meaning of that term as found in our usury laws ? If such purchaser is the “ borrower ” of the money, then the bank in this case is entitled to the relief sought by the bill, and the decree of the chancellor must be affirmed. This is a question of great interest in the construction of these laws, and I shall examine it with the attention which its importance demands.
It appears that this question has been examined by the learned vice chancellor of the 8th circuit in the case of Cole v. Savage, (1 Clark, 482,) which I shall have occasion to notice particularly hereafter, and by the learned vice chancellor of the 5th circuit in the case .now under consideration; and they have both arrived at the conclusion, that a grantee of the mortgagor, whether by deed directly from the mortgagor, or by *400 operation of law, as in the case of a purchaser at a sheriff’s sale, was not a “ borrower ” within the provisions of the usury laws. And the vice chancellor of the 5th circuit, on dismissing the bill in this cause, in a very short, but to my mind unanswerable opinion, has assigned the true reasons why the Utica Bank is not to be deemed a “ borrower ” of the money loaned by the appellant to Dart: and I shall b'e excused for embodying his reasons in this opinion, as I consider them entirely sound, and expressed in language appropriate and comprehensive. He says: “ The word ‘borrower ’ has a definite meaning, wholly inapplicable to any other than one. who is a party to the contract for the usurious loan; and had the legislature intended to dispense with the condition in question [the payment or offer of payment of the sum loaned] in all cases, nothing was easier than to have said so, ' It is also worthy of remark that a question was raised upon the meaning of the word borrower,’ as used in the provision of the revised statutes before cited, [1 R. S. 772, § 8,] in the case of Livingston v. Harris, (11 Wend. 329,) several years before the passing of the act of 1837. The legislature, therefore, in this last act, must have used the term with full knowledge that the restricted meaning had been claimed for it in that case; and had they intended a more enlarged meaning, they would probably have expressed their will in unqualified language. The legislature may well be deemed to have regarded the real ‘ borrower,’ the victim of the usurer, with more favor than a grantee of lands bound by the mortgage, who may have purchased the lands with reference to the incumbrance, and with a deduction from the purchase price equal to the amount of such incumbrance.”
The vice chancellor might, with great force, have referred to the facts in this case, as furnishing an apt and striking illustration of the propriety of his last remark. In 1835 Post was willing to loan five thousand dollars upon the property in question. In the exercise of ordinary prudence as a money lender, he would not be likely to take a mortgage for a sum much exceeding half the cash value of the lands mortgaged. It may then be fairly assumed that the premises in controversy were *401 worth eight thousand dollars in 1835. Yet those acting in behalf of the bank, when they came to purchase in 1842, were found unwilling to bid beyond three thousand dollars for the entire mortgaged premises. They may well be presumed to have bid in reference to the incumbrance of the appellant’s mortgage, and with the reasonable expectation that they could afford to give the sum bid and pay off the mortgage.
This to my mind is the common Sense view of the question presented for consideration. It assumes that the legislature well understood the use and meaning of the terms employed in these usury laws; that when they gave to the‘borrower’of money at usurious interest, the new right to come into the court of chancery for relief against the usurious contract, without imposing upon him the duty and necessity of paying or offering to pay the money actually loaned, they regarded him as the real and only sufferer by the harsh exactions of the usurer; and that all other persons, not being borrowers or their sureties, heirs, devisees or personal representatives, (who stand upon entirely different ground than the grantee of the borrower, as I shall presently show,) seeking to remove a usurious incumbrance, or avoid a usurious contract, must “ do equity” before they could invoke the extraordinary powers of the court of chancery in avoiding a contract to which they were not parties, and by which they were in no way bound or made liable. This view, moreover, gives to the terms and words employed in these laws their proper and ordinary meaning—such meaning as men not versed in technical subtleties and refined distinctions would naturally and at once affix to the language employed—and makes the laws upon our statute books, what the framers designed they should be, intelligible to the great mass of the. community.
Law making is not one of the powers conferred upon the courts of this country. They are to expound the law as they find it upon the statute book, intelligibly, reasonably, and in reference to the fair intent and meaning of the legislature. It is much safer to trust the law making power with the remedy for defects and imperfections in our statutes, than to convert our *402 judges into judicial legislators. In arbitrary governments the law making power ever finds willing agents, through its judges and courts, so to interpret the laws as shall best suit the designs and wishes of the sovereign, or the favorite minister. But here, although we give to the courts the power to pronounce what the law is, we should not and will not, regarding the safety of our rights and the harmony of our republican system, permit the courts to make as well as pronounce the law.
But the learned chancellor, in the case of Cole v. Savage, (10 Paige, 583,) has decided that the term “ borrower ” in the usury laws has a much broader and more extended meaning than I can give to it. And upon the opinion delivered in that case he reversed the decree of the vice chancellor in the cause under consideration. The respect due to that distingushed and enlightened judge demands from me an examination of his reasons for the opinion pronounced.
I fully assent to the opening remark of the chancellor in Cole v. Savage, that it presents a case of “ most gross and extortionate usury.” In 1835, a loan of seventeen hundred dollars was made by D. S. Cole of one Chittenden, for which a bond and mortgage of twenty-seven hundred dollars was exacted and taken. At the expiration of the first year, the interest on the whole sum was paid by Cole, and one hundred and eighty-nine dollars for further forbearance of the principal. At the end of the second year, Cole paid in cash and a note signed by himself and his brother, John E. Cole, eight hundred and thirteen dollars—the whole of which was retained as usurious premium, except the interest due, and one hundred and fifty dollars which was loaned back to the mortgagor.
Such were the terrible exactions of this Shylock upon D. S. Cole, the mortgagor. In 1837, D. S. Cole conveyed the mortgaged premises to his brother J. E. Cole, the complainant, with warranty. D. S. Cole having failed, and the complainant being liable icr die six hundred dollar note signed as surety for D. S. Cole, as Vítll as the interest due upon the bond and mortgage, was called upon by Chittenden for payment of both; and not being in a situation to meet this call, he made a new arrange- *403 m'ent with Chittenden. It was agreed that Chittenden should advance to the complainant seven hundred and twenty-six dollars, and take his bond and mortgage for sixteen hundred dollars upon other lands. This bond and mortgage included the six hundred dollar note, the interest on the twenty-seven hundred dollar mortgage, and about thirty-two dollars for usurious interest. The complainant was also required to and did guaranty the payment of the large bond and mortgage in three years, with interest payable semi-annually, and agreed that if the interest was not paid when due, he should be immediately liable upon his guaranty for the whole sum of twenty-seven hundred dollars, and the interest. The complainant paid the interest on the large bond and mortgage to October, 1838. Chittenden died in 1840, and his executors proceeded to foreclose the twenty-seven hundred dollar bond and mortgage under the statute. J. E. Cole then filed his bill against the executors of Chittenden, praying that the bond and mortgage, and his guaranty thereof, might be surrendered up and cancelled. The vice chancellor of the eighth circuit decided that the complainant was not a “ borrower,” and not entitled to the relief sought, without paying or offering to pay the amount justly due on the bond and mortgage.
It was upon a case containing these évidences of the grinding power of the usurer, that the chancellor was called upon to examine the abstract question whether a grantee of the mortgagor was a “borrower,” within the true' meaning of that term in the usury laws; and it is not unreasonable to suppose, that with such a call upon his sense of jtistice as the facts there presented, he would struggle hard to make the law of the court of chancery come up to the relief of the despoiled and ruined victim before him. My apology for occupying so much space with these facts is, that in my opinion they furnish much stronger ground for the liberal interpretation given by the chancellor to the statutes in question, in the particular case then under his consideration, than any reasons drawn from the acts themselves, or from any general and safe rule of interpretation.
I fully agree with the chancellor in his exposition of the design and object of the revisers in the various provisions reported *404 by them to the legislature, requiring the “borrower” to deposite with the register or clerk of the court the principal sum admitted by him to have been loaned. They evidently intended to compel the “borrower” to “do equity,” if he sought the aid of the court of chancery in avoiding the usury. But the legislature did' not adopt the principle proposed by the revisers as to the “ borrower” of the money. They substituted in lieu of the revisers’ proposition, the last clause of the eighth section of 1 R. S. 772, which excuses the “borrower” from payment or offer of payment of the principal sum loaned, or any part thereof, as a condition for granting relief. But all this proves nothing save the declared intention of the legislature to remove and take away from the “borrower” all the previous restraints which the law of the court of chancery had imposed as a condition for granting him relief from a usurious contract. It does not advance us one step in the important inquiry, who is the “ borrower?” It clearly does not prove that a grantee of the “borrower.” was intended by the legislature, but leaves the settlement of that question to common sense and the right use of language.
The chancellor is constrained to" admit that the word “ borrower” alone is found in the section of the statute. He insists, however, that if the statute is to be construed literally, by restraining the term “ borrower ” to the particular individual to whom the loan was actually made, the remedy which the legislature intended to give a complainant who comes into the court of chancery for relief against a usurious security, will not benefit either the surety of the borrower, his grantees, or heirs, devisees or personal representatives.
Although upon well settled and safe principles in the interpretation of statutes like the usury laws, I am unwilling to extend the remedies given, by inference or implication, beyond the clearly expressed language of the legislature, yet I think it can be easily shown that a surety of the borrower, his heirs, devisees and personal representatives, can be included within the spirit .and language of the section under consideration, without doing violence to any proper rule of interpretation, or to the term “ bor *405 rower” itself. A surety, although not the actual recipient of the money loaned, is yet a party to the original contract, and is liable upon it equally with the principal who borrows the money. The heir, devisee and personal representative, although not immediate and direct parties to the original contract, are bound by it when they succeed to the estate of the testator or intestate. They are liable upon the original contract, and not in virtue of any new one. This view of the question is fully sustained by the apt and significant definition given. of the term “ borrower” by Senator Tracy in Livingston v. Harris, (11 Wend. 329.) “It should be construed,” he said, “ to mean any person who was bound by. the original contract to pay the sum borrowed.”
But what has the grantee of the borrower to do with the original contract of loan ? How is he liable upon that contract to pay the money borrowed? What connection in law exists between the lender of the money, and a purchaser of the mortgaged premises from the mortgagor? Or, to come directly to the present case, how are the respondents to be connected with a loan made four years before they recovered their judgment against Dart, the borrower of the money from Post, and six years before they obtained a deed for the premises sold under - that judgment ? Let it be observed, moreover, that the principle adopted by the chancellor will afford the most remote grantee of the mortgagor relief against the usurious mortgage. It will not do, according to his construction, to stop at the immediate grantee; but the grantee in the tenth generation, if he is within the statute of limitations, has the same right to the relief as the first successor to the estate.
The chancellor says it is impossible to believe that the legislature- intended to exclude a grantee from the benefit of the provision in the usury law. I ask with all submission whether it is not more impossible, (if a thing can be said to be so;) to believe, that the framers of the section could ‘have contemplated that a purchaser at a sheriff’s sale of lands covered by a usurious mortgage, would come into the court of chancery, years after the usurious loan was made, and claim that as the *406 “ borrower ” he had been the victim of a usurious loan; that his rights acquired long after the usurious incumbrance was created, had been violated? It seems to me that fourteen years, the time that has elapsed since the passage of the revised statutes, is not long enough to justify the presumption that a “ borrower” of money then, has been converted into his grantee now; especially as the English language and the interpretation of words remains the same.
We are not wholly without authority for the principle I am endeavoring to establish, viz: that no one but the party to the usurious loan should be permitted to avoid the contract. In Reading v. Weston, (7 Conn. Rep. 413,) Chief Justice Hosmer says : “ It has been long and uniformly established law, that one not a party to an usurious contract, may not, for this cause, invalidate it. The reason is extremely obvious. The law of usury was made to prevent oppression, and to rescue the party oppressed; but it never was intended for the benefit of those who are not and cannot be injured by an usurious transaction.” In De Wolf v. Johnson, (10 Wheat. 367, 393,) it was held that the purchaser of an equity of redemption cannot set up usury as a defence to a bill filed by the mortgagee for a foreclosure, especially if the mortgagor has himself waived the defence. And Mr. Justice Johnson in this case says, that the defence of usury is a personal thing. These cases regard the party to the contract, or those liable upon it, as the only persons who upon principle should be allowed to avail themselves of the usury; and they are cited merely to show that a grantee of a mortgagor is not regarded as a party to the usurious contract, and hence should not be permitted to take the place of such party in avoiding his contract.
But the chancellor further insists, that the usury law of 1837 is a remedial statute, and therefore should be construed liberally to carry into .effect the intention of the legislature; and that it may be extended by construction to other cases within the same mischief, though not within the words of the statute. And to illustrate his view of the manner in which the law should be interpreted, he cites a case from 3 Coke’s Rep. 4, in which it *407 was held that a statute of 9th Richard 2d, chapter 3, which in its terms gave a writ of error to the reversioner, upon a recovery against the tenant for life &c., extended to the remainderman. I would concede the aptness of the illustration, if the two statutes were alike in their character. The statute i'n the case cited was purely remedial. It had not penalties of fine, imprisonment and disgrace attaching to a violation of its provisions. Besides, the remainderman has the same interest in the right to bring error as the reversioner. They both have an interest in the estate, and in fact both estates may be vested in the same person. In the case cited, therefore, no violence is done to the terms employed by the legislature, much less to the spirit of the statute.
But I deny that the usury law of 1837 is entirely a remedial statute, or that it is to be interpreted with the same freedom and liberality exercised by the English court in the case cited by the chancellor. True, it gives the party setting up usury at law an additional and easy mode of proving it, by calling the plaintiff upon the stand, or, as was held in the case of Stevens v. White, (5 Hill, 548,) by calling the defendant as the plaintiff, and compelling him to disclose the iniquitous contract; but it also subjects the party who is thus dragged against his will and interest to testify, to the penalties of perjury for false swearing, and, in addition to this, it makes the taking of usury a misdemeanor, punishable by a fine not exceeding one thousand dollars, or imprisonment not exceeding six months, or both. Its penalties are much heavier than, its remedies are useful or salutary. It falls properly within the definition of a penal statute, and as such should be construed strictly.
But there is no rule of construction applicable to remedial statutes which will justify the substitution of one word for another of entirely different signification. Chancellor Kent says, that “ the words of a statute, if of common use, are to be taken in their natural and ordinary, signification and import.” (1 Kent's Comm. 462.) Again : “ The words of a statute are to be taken in the sense that would convey the meaning required to all men of ordinary discernment alike, and that may be called *408 Certain without recurring to possible facts which do not appear.” (Id. note (f), citing 9 Verm. Ref. 269.) And Mr. Justice Bronson, in Waller v. Harris, (20 Wend. 561, 2,) says, that “ except in relation to a few old statutes which were long since overwhelmed by commentaries and decisions, the current of authors at the present day is in favor of reading statutes according to the natural and most obvious import of the language, without resorting to subtle and forced constructions for the purpose of either limiting or extending their operation. Courts cannot correct what they may deem either excesses or omissions in legislation, nor relieve against the occasionally harsh operation of statutory provisions, without the danger of doing vastly more mischief than good.”
These just, equitable and sound rules of interpretation, when applied to the law in question, relieve it, in my mind, from all difficulty; and the result at which I have arrived is, that a grantee of land covered by a usurious mortgage is not a “ borrower” within the fourth section of the act to prevent usury, passed in May, 1837. I think the vice chancellor of the fifth circuit properly allowed the demurrer to the complainant’s bill, for want of an allegation or offer of payment of the money actually due upon the mortgage of Post; and that the decree of the chancellor should therefore be reversed.
Senators Hard and Rhoades also delivered opinions in favor of reversing the chancellor’s decree, on the ground that the respondents were hot borrowers within the meaning of the statutes relating to tistiry.
Porter, Senator.
According to the law of the court of chancery, as it Was administered in England and in this state previous to the adoption of the revised Statutes, the usurer was made secure in the amount of money he actually lent, even in á case where a bill was filed to.set aside á security taken for the loan, though the statute laWs of both countries had declared expressly that not only the security but the contract for the loan was absolutely void. The complainant was required to pay or *409 offer to pay the sum lent, before he could entitle himself to relief or discovery on the ground of usury. This disregard of the. plain provisions of the statute was always justified upon the strength of a maxim in that court that “ he who asks for equity must do equity.” The maxim is doubtless founded in great justice and sound wisdom; but who that reads and reflects can fail to perceive that it was originally adopted, in its application to cases where relief was sought from usurious contracts, in defiance of law. The court of chancery seems in its earlier history to have arrogated to itself a higher degree of wisdom and a more refined sense of justice than it was willing to concede to parliamentary law, and hence in this respect set itself above law. It declared that if any one who considered himself injured in the matter of usury would come into that court for relief, he must come not only with clean hands as it respected past transactions, but he must give a guarantee that he would not be guilty of injustice thereafter by withholding from the creditor as much money as in conscience ought to be paid.
But the maxim that “ he who asks for equity must do equity” was adopted and became established in this respect as a fundamental doctrine of the court of chancery 5 and was followed by that court in England and in this state until the revised statutes interposed. The court would neither allow a discovery nor grant relief without a repayment of the sum actually lent with lawful interest. Such is believed to have been the invariable rule. The revised statutes, however, abolished this rule so far as it related to the relief which the court is authorized to grant against a usurious contract or security. (1 R. S. 772, § 8.) The latter clause of the section cited declared that no court of equity should require or compel the payment or deposit of the .principal sum, or any part thereof, as a condition of granting relief to the borrower in any case of a usurious loan &c. (Vide Livingston v. Harris, 3 Paige, 533; S. C. 11 Wend. 329.) Then came the act of 1837, (Sess. L. of 1837, p. 486,) the fourth section of which declares, that whenever any borrower of money shall file a bill in chancery for relief or dis- *410 covert/, or both, against any violation of the provisions of this or the former act, it shall not he necessary for him to pay or offer to pay any interest or principal on the sum loaned, nor shall the court require or compel the payment or deposit of the principal sum or interest, or any portion thereof, as a condition of granting relief or compelling or discovering to the borrower in any case, usurious loans forbidden by this or the former act. This act for the first time placed the borrower and lender on an equal footing in litigating the question of usury. It abrogated in toto that rule which had so long prevailed in the court of chancery, by which the court had compelled complainants to pay money upon contracts which -the statute law declared to be absolutely void; and authorized borrowers to litigate the question of usury as complainants, Without paying or offering to pay the sum of money actually loaned.
In this case, the respondents have filed thei'r bill to set aside a mortgage held by the appellant, on the ground that it formed an unjust cloud upon their title to the mortgaged premises, alleging that the mortgage was void for usury. The appellant demurred to the bill, for the reason that it contained no averment of the payment of the sum actually advanced, nor any offer to pay; and also because it did not appear that the respondents were the borrowers of the money, but on the contrary, that they were not the borrowers.
By the terms of the act, borrowers alone ate ’exempted from the operation of this rule of the court of chancery to which I have referred and against the effect of which these statutes were passed. The respondents, being purchasers of the premises at a sale by the sheriff on an execution against the mortgagor, claim to be embraced by the term “ borrower,” and that the court has no right to require a payment or offer of payment from them of the sum actually loaned, or any part thereof, as a condition of granting the relief for which they pray. On the other hand, the appellant insists that they are not the borrowers, and therefore are not embraced within the act. This court has, therefore, now devolved upon it the duty of determining whether *411 the term “ borrower,” as used in the section under consideration, will include the purchaser of the title of the mortgagor.
It is contended for the appellant that the respondents are in no sense or manner borrowers; that the term has a well understood and definite meaning, and is wholly inapplicable to the respondents; and that it should be taken in this act in its strict, literal sense. In the case of Livingston v. Harris, supra, both this court and the court of chancery take for granted that the term “ borrower” in the act includes a surety. There, the complainant Livingston was a mere surety for the borrower of the money. In no strict or literal sense could he be" called the “ borrower.” He had nothing to do with the contract which resulted in the loan, nor with any other contract but that of payment. The agreement to make the loan must have been completed before he participated in the transaction, and to call him a “ borrower ” would be quite as free and liberal a use of the "term as ,it would be to call the purchaser in this case a “ borrower.” Indeed, in one aspect, they are similarly situated, for they are both bound to pay the debts, if they are existing and valid debts. But if the statute is to be confined to the identical person who obtains the loan, his executors or administrators must be excluded. They would represent the borrower in the proper case, but they could hardly be called the borrower. His rights and duties in respect to debts devolve upon them, and I think it would hardly be contended that they are not embraced in the act. So in the case of heirs or devisees of the debtor, who represent him in respect to the real estate, by operation of the law, or by devise, as truly as does the executor or administrator in respect to the personal estate. And can it be argued with any force or propriety that an heir would be holden in law to pay the money actually loaned, on a usurious security which was a lien upon the real estate he took by descent, before he could be permitted to contest the validity of the loan, while his ancestor would be suffered to’litigate it without such payment? And yet the heir is in no sense a borrower, any more than is a purchaser. There is a privity between a borrower, and the heir, devisee, or purchaser, which entitles them to succeed to *412 the same rights which the borrower possessed, and by reason of which, as it seems to me, any sound construction of the statute should include them.
It is objected that the statute is penal in its character, and that, as it alters a long established and well known rule of equitable jurisprudence, its meaning and scope should not be enlarged beyond the literal signification of its terms, but it should be construed strictly. It is true that in some of its provisions the act is penal, and imposes forfeitures, but in others, and those more immediately connected with this controversy, it is highly remedial. To be enabled to judge of the force of these objections we must look at the evils which were supposed to exist; or at the defects in legislation which gave rise to the alteration in the statute. We have seen that, prior to the year 1830, when the revised statutes went into operation, if a borrower upon a usurious contract or security was compelled to resort to the aid of the court of chancery to obtain any discovery or relief against a usurious demand, he was obliged to pay or offer to pay the sum actually received, with interest, as a condition upon which the court would consent to listen to his complaint. When the revised statutes and the act of 1837 directed the court to abandon that condition, and entertain the question upon its real merits, it was a pretty clear intimation that the legislature deemed such a restraint upon the judicial investigation of an alleged infraction of a positive statute, an evil worthy of its correction. The evil was not that the borrower alone was prevented from having the aid of the court, except upon condition; but it was that the court would' not exert its power or entertain any question in cases connected with usury, in favor of those who did not comply with the condition. The statute does not reprobate usury and declare all usurious contracts and securities void, in favor of the borrowers alone, but in favor of every one whom it may concern. They are declared to be void without respect to individuals ; and I think, therefore, it would be a narrow and illiberal construction of the provision of the statute, which every otie must confess to be remedial, to limit the beneficial effect of it, and the *413 reformation designed by the law makers, to the person obtaining the loan.
Whatever may be my opinion of the policy of our usury laws, I am clear that, while we have such laws, this court is bound to give them effect according to the obvious intent of the legislature. These laws have not only defined usury, but have denounced it as inimical to the public welfare, and it is the duty of the courts to see that they are faithfully enforced. The case before us is to my mind clearly within the evil which the recent statute was designed to remove, and if the court should refuse to extend the term “borrower” to meet this case, I think the intent of the legislature would be defeated.
The supreme court decided, in the case of Jackson v. Dominick, (14 Johns. 435,) that when the mortgagee in a usurious mortgage, sells the premises by virtue of the power of sale, and buys them in himself, and goes into possession, a purchaser of the equity of redemption may, upon proof of the usury, recover the possession of the premises. So in this case, if Post had advertised and sold these premises upon his mortgage, bid them in himself, and gone into possession, the bank, as purchaser of the equity of redemption, could have recovered the possession from him, on proof of the usury; and this follows from the privity that exists between the mortgagor and his grantee. But the appellant contends that the respondents are bound to pay or offer to pay the money loaned, with interest, before they can be permitted to litigate" the qqestion of usury in the court of chancery. In my judgment it would be discreditable to the law if it should be determined that the construction of the statute for which the appellant contends is the true one; for in that case the success of the lender in recovering the money loaned would depend upon the court in which the litigation was carried on, rather than upon the laxy of the land.
But if the fourth section of the act of 1837 had been entirely omitted, I still think there would be enough left in that statute to sustain the decree of the chancellor in this cause. The first and fifth sections of the act, taken together, amount in my judgment to a virtual abrogation of the rule of the court to which *414 'reference has been so ofteir-made. By the first section, all bonds, bills; contracts, securities &c., whereupon or whereby usurious interest shall be reserved or taken, or secured, or agreed to be reserved or taken, are declared to be void. And by the fifth section it is enacted as follows: “ Whenever it shall satisfactorily appear by the admissions of the defendant, or by proof, that any bond, bill, note, assurance, pledge, conveyance, contract, security, or any evidence of debt, has been taken or received in violation of the provisions of said title or this act, the court of chancery shall declare the same to be void, and enjoin any prosecution thereon, and order the same to be surrendered and cancelled.” The rule of the court requiring payment or offer of payment was founded on the assumption that the contract or security xvas usurious, and xxmuld be declared void, and the object xvas, to save to the lender xvhat the court deemed his equitable rights, that is, the money actually advanced, with interest. For if the security was not usurious and void, the lender would be in no jeopardy, and the rule of the court would be without an object. If the rule is founded upon the assumption I have mentioned, then hoxv does the question stand ? Suppose the court, in any given case, should require payment of the sum loaned as a condition of entertaining the suit, and should determine upon the hearing that it appeared by the proof that the security had been taken in violation of the provisions of the said act. The law would then require the court to enter a decree declaring the security void, and forbidding any prosecution thereon, and ordering the same to be surrendered and cancelled. Would not such a case present an absurdity? It would exhibit the court as in one stage of the suit requiring the party who obtained the loan to pay the lender the sum actually received upon the security, and at another stage of the same suit, and in respect to the same matter, declaring1 the security void, enjoining the lender against collecting it, and ordering him to surrender and cancel it! The statute does not say that the court shall declare the security void at the instance of the borrower; but it declares all such securities void, and that whenever, at the instance of any one to be affected by the security, it shall be made *415 to appear to be usurious, the court shall declare it void and order it to be cancelled* Nor does the statute say that the security shall be void for the excess, over and above the sum actually received; but that “ the same” that is, “ the contract, security or other evidence of debt” shall be declared void. Neither does the statute say that the court shall enjoin any prosecution for the excess, but that “the court shall enjoin any prosecution thereon ” that is, on the security or evidence of debt.
The statute cannot be chargeable with such inconsistencies, and I perceive no possible way to avoid them but by saying, that when the act has provided for such a disposition of the security upon proof of usury, it is manifest that it no longer authorizes the court to adhere to the old rule requiring payment or offer of payment. And besides, in this way only can the courts carry out effectively the explicit provisions of the several acts to prevent usury, which prohibit the lender, when the usury is proved, from collecting the debt or any part of it.
I think the chancellor was right in saying that the demurrer was not well taken, and shall therefore vote to affirm his decision.
On the question being put, “Shall this decree be reversed?” the members of the court voted as follows:
For reversal i Senators Barlow, Bartlit, Chamberlin, .Corning, DenMiston, Hard, Johnson, Lester, Lott, Platt, Rhoades, Smith, Strong, Varney, Works and Wright—16.
For affirmance: Senators Mitchell and Porter—2.
Decree reversed.